IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GARY ZLOTORZYNSKI,  *
    Plaintiff,
       v.  *  CIVIL ACTION NO. DKC-10-2120

BRUCE BOZMAN, et al.,  *
    Defendants.
                   ***

## **MEMORANDUM OPINION**

Pending is the motion of Defendants Bruce Bozman and Kathleen Green to Dismiss or for Summary Judgment. ECF No. 18. Plaintiff has not responded.[1] Upon review of papers and exhibits filed, the court finds an oral hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2011).

### **Background**

Plaintiff alleges that in July of 2009, while incarcerated at the Eastern Correctional Institution ("ECI"), his throat was cut with a razor by another inmate. He states that Case Manager Bozman was aware there was a hit on Plaintiff as Bozman had heard recorded telephone conversations between an inmate and "someone on the outside." Plaintiff states that Bozman did nothing with this information. He states that after the attack, Bozman advised Plaintiff he was safe, removed Plaintiff from administrative segregation, and returned Plaintiff to the same housing unit. Plaintiff states he was assaulted again on August 18, 2009. He claims he was then transferred to a Hagerstown facility with the inmate that attacked him. He states that while in Hagerstown he was hit with a "lock in a sock." ECF No. 1.

---

[1] Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), on June 13, 2011, Plaintiff was notified that Defendants had filed dispositive motions, the granting of which could result in the dismissal of his action. ECF No. 19. Plaintiff was informed that he was entitled to file materials in opposition to that motion within seventeen (17) days and that his failure to file a timely or responsive pleading or to illustrate, by affidavit or the like, a genuine dispute of material fact, could result in the dismissal of his case or in the entry of summary judgment without further notice of the court. *Id.*

**Standard of Review**

Under revised Fed. R. Civ. P. 56(a):

A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in a light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252.

This court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D. Md. 2001) (citation omitted). Indeed, the court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humpreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).

### Discussion

A.  Exhaustion

The court must first examine Defendants' assertion that Plaintiff's case should be dismissed in its entirety due to Plaintiff's failure to exhaust available administrative remedies. The Prison Litigation Reform Act ["PLRA"] generally requires a prisoner plaintiff to exhaust administrative remedies before filing suit in federal court. Title 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Thus, the

exhaustion provision plainly extends to Plaintiff's allegations. His complaint must be dismissed, unless he can show that he has satisfied the administrative exhaustion requirement under the PLRA or that defendants have forfeited their right to raise non-exhaustion as a defense. *See Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003).

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase*, 582 F.Supp.2d at 530; *Gibbs v. Bureau of Prisons*, 986 F.Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

In Maryland, filing a request for administrative remedy with the Warden of the prison in which one is incarcerated is the first of three steps in the Administrative Remedy Procedure ("ARP") process provided by the Division of Correction to its prisoners. If this request is denied, the prisoner has ten calendar days to file an appeal with the Commissioner of Correction. If this appeal is denied, the prisoner has thirty days in which to file an appeal to the Executive Director of the Inmate Grievance Office ("IGO"). *See* Md. Code Ann. Corr. Serv. §§ 10-206, 10-210; Md. Regs. Code title 12 § 07.01.03.

The facts regarding Plaintiff's efforts to exhaust his administrative remedies are not in dispute. Plaintiff submitted several administrative remedy requests during his incarceration at ECI. ECF No. 18, Ex. D. On November 10, 2009, Plaintiff submitted three ARPs regarding an assault. The first, ECI 6202-09, stated he was having vision problems as a result of being cut by another inmate. He stated he put slips in to be seen by medical but he did not receive a response. The ARP was later withdrawn. *Id.*, p. 15-16. The second, ECI 6203-09, requested he be placed on protective custody due to threats against him by gang members. He stated he had already been "hit" twice and asked to see Bozman. The ARP was dismissed as it was deemed to concern a case management decision which are not subject to the ARP process. Plaintiff did not appeal this determination. *Id.*, p. 17. The third, ECI-6204-09, requested he be able to speak with someone about pressing charges against the inmate that assaulted him. This ARP was dismissed as the relief requested could not be obtained through the ARP process. *Id.*, p. 18.

Defendants maintain that Plaintiff's failure to appeal the dismissal of his ARP regarding his desire to be placed on protective custody should result in the dismissal of his case. The court disagrees. Plaintiff was advised that the subject matter of his complaint could not be addressed through the ARP process. *Booth* requires exhaustion of administrative remedies even if the relief requested is not available but only when there is the possibility of some relief for the action complained of. *Booth*, 532 U.S. 731, 738-9. Here, Plaintiff was advised that no relief was available through the administrative process for case management decisions.

B.     Respondeat Superior

As a fundamental element of § 1983 liability, Plaintiff must show that the named Defendants were involved in the alleged deprivation of his constitutional rights. It is well established that the

5

doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir.2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir.2001), *citing Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.1994).

Plaintiff has pointed to no action or inaction on the part of Warden Green that resulted in a constitutional injury. In fact, Plaintiff has merely named the Warden in the caption of his complaint and provided no facts linking Warden Green to the actions that comprise his claim. Warden Green is entitled to dismissal from suit.

C. Failure to Protect

Plaintiff alleges that Bozman was deliberately indifferent in failing to provide adequate security to protect him and as such his right to be free from cruel and unusual punishment has been

violated. The Eighth Amendment recognizes this right. *See Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990).

As noted by the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994).

> Prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners. Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.

*Id.* at 833 (internal quotations and citations omitted). In a failure to protect claim, a prisoner must show, first, that the harm he suffered was objectively serious, and second, that prison officials acted with deliberate indifference. *Id.* at 834.

Defendant Bozman avers that he is a case management specialist assigned to ECI. His caseload includes inmates on administrative and disciplinary segregation and he works closely with the ECI Intelligence Unit to manage members of security threat groups. Bozman states that he was well acquainted with Plaintiff while Plaintiff was incarcerated at ECI. Plaintiff was, at one time, a high-ranking member of Dead Men Incorporated (DMI) and his nickname was Lucky. ECF 18, Ex. A.

In early 2009, intelligence units throughout the Division of Corrections were paying special attention to DMI. It was believed that April 13, 2009, would hold special significance to DMI as the number in that date corresponded to the order of the letters of DMI in the alphabet. Rumors circulated that DMI leaders planned to mark the date by assaulting a number of DMI members due

to suspected transgressions against the group. Bozman learned that Plaintiff might be among those likely to be assaulted. *Id.*

In late March, Bozman met with the founder and leader of DMI, inmate Perry Roark. Bozman, a 23-year veteran of the DOC, knew Roark for many years and had developed a good rapport with him as Roark had assisted in straightening out many problems. At the time of the meeting, Bozman reports, there was disharmony within DMI. Plaintiff "was not in good graces with some DMI leaders because he often shared inside information about threat group activity with ECI's administration to curry favor for himself and other select members of DMI." *Id.* Roark assured Bozman that Plaintiff was not an intended target of an assault, another inmate also nicknamed "Lucky" was the intended target, and Plaintiff was not in any danger. *Id.*

At the time of Bozman's interview with Roark, Plaintiff was not housed at ECI. He returned to ECI on April 2, 2009, and was placed in disciplinary segregation. In early April, 2009, Bozman met with Plaintiff and relayed to him the conversation Bozman had with Roark. Plaintiff stated that he was happy and wanted to stay at ECI, returning to general population when his segregation time ended. On April 16, 2009, Plaintiff was returned to general population and removed from Bozman's case load. *Id.*

On an unspecified date, ECI intelligence received information that Plaintiff and two other inmates were targeted by DMI. Plaintiff and the other inmates were placed on administrative segregation for their safety on April 29, 2009. Bozman again met with Roark regarding the threats against Plaintiff. Bozman advised Roark that information given to Roark regarding Plaintiff was mistaken---acts attributed to Plaintiff could not have been done by him as he was not housed at ECI at the time of the alleged "transgressions." It appeared to Bozman that lies were being told about

8

Plaintiff because of a power struggle within DMI. Roark advised Bozman that the "hit" was removed but Plaintiff and the other two inmates should sever their ties with DMI to guarantee against future assault. Bozman again met with Plaintiff and advised him that Roark said Plaintiff should end his affiliation with DMI. Plaintiff said he would cut his ties with DMI and reiterated he wanted to stay at ECI in general population. Other DMI leaders at ECI were interviewed and advised as to what Roark had said regarding the hit on Plaintiff. They all indicated they understood and would abide by Roark's directives. Bozman avers that based on this activity, he believed Plaintiff was not in danger of assault by DMI members. *Id.*

On May 7, 2009, Plaintiff was returned to general population and removed from Plaintiff's case load. Thereafter, Bozman saw Plaintiff on the compound and spoke with him on a number of occasions. Plaintiff reported that everything was fine and did not indicate any concerns regarding his safety. *Id.*

On August 19, 2009, Plaintiff was sent to the ASOA area because of a claimed assault on him by a DMI member. At an unknown time Plaintiff suffered a small cut on his neck which left a scar. This incident had not been reported to correctional officials.[2] When Bozman interviewed Plaintiff he asked Plaintiff if he had been "hanging out" with DMI. Bozman inferred from Plaintiff's responses that he had either been "hanging out" with DMI or attempting to rejoin the group by exchanging correspondence with DMI leaders. Bozman offered to place Plaintiff in administrative segregation for his safety or to transfer him to another institution. Plaintiff replied that he wished to return to general population at ECI, he had a good relationship with his cellmate, he did not fear for

---

[2] Whenever an inmate is stabbed, slashed, or cut by another inmate a Serious Incident Report (SIR) is prepared. Additionally, such assaults are reported to the Internal Investigative Unit for investigation. SIR reports are kept on file in the Warden's office. A review of SIRs from 2009 finds no report of a July or August attack on Plaintiff. ECF No. 18, Ex. B. A review of Plaintiff's medical records demonstrates that he did not seek or receive care for a stab wound to his

9

his safety, and he was trying to work out his differences with DMI. Bozman advised Plaintiff not to affiliate with DMI unless he had worked out his differences. Bozman believed, based on his experience, that the minor nature of the cut on Plaintiff's neck indicated that the assailant intended to "send a message" to Plaintiff rather than seriously harm him. Plaintiff was returned to general population and removed from Bozman's caseload on August 20, 2009. *Id*.

On October 18, 2009, Plaintiff was assaulted by a DMI member. He was placed on administrative segregation and returned to Bozman's caseload. Plaintiff was placed in the disciplinary segregation unit because Bozman felt Plaintiff could be more safely housed there, as other inmates affiliated with DMI were housed on the administrative segregation unit. Bozman received information that Plaintiff had continued to associate with DMI despite warnings given to him by Bozman. Bozman met with Plaintiff and told him that despite his desire to remain at ECI he would be transferred for his safety. *Id*.

In November, 2009, Plaintiff requested he be moved to the administrative segregation unit or released to general population. Bozman deemed it unsafe to return Plaintiff to general population. He was transferred to the administrative segregation unit, pending transfer, after Bozman determined there were no longer DMI inmates/enemies of Plaintiff housed in the unit. He was later transferred from ECI. Bozman had no role in the actual transfer of Plaintiff or the selection of Plaintiff's new facility. *Id.*

Assuming, arguendo, that Plaintiff's injuries from the assault were held to satisfy the first prong of the *Farmer* test, the second element is more problematic.

---

neck. *Id., Ex. C.

Deliberate indifference in the context of a failure to protect claim means that defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Unless a prison official actually makes this inference, he does not act with deliberate indifference, even where his actions violate prison regulations or can be described as stupid or lazy. *Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997); *see also Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997) ("[T]he fact that an inmate sought and was denied protective custody is not dispositive of the fact that prison officials were therefore deliberately indifferent to his safety.").

After Bozman twice became aware that Plaintiff was the possible subject of a DMI assault he contacted the leader of DMI and was assured that the assault was not planned for Plaintiff. Bozman then relayed all that he knew about the threats and assurances to Plaintiff. Plaintiff repeatedly voiced his belief that he could be safely housed in general population and his desire to stay at ECI, despite Bozman's offer to move him. There is no record that Plaintiff was assaulted in July as he alleges. There is no SIR or medical record to support his claim. Even after he reported the attack to Bozman, in August, 2009, he stated that he believed he could safely be housed at ECI in general population. After Plaintiff was attacked in October, 2009, he was removed from general population and ultimately transferred from ECI. The evidence demonstrates that against advice, Plaintiff engaged in activity which endangered his safety, i.e. failing to sever all ties with DMI. The evidence further demonstrates that at all times Bozman acted in concert with Plaintiff to evaluate the threat against Plaintiff and take what at the time appeared to be necessary precautions. Bozman believed, based on his experience, interview with DMI leadership, and Plaintiff's own representations that he could be safely housed in general population. That Plaintiff and Bozman were wrong in this decision does not

11

mean that Bozman was deliberately indifferent to Plaintiff's safety. As noted, a prison official is deliberately indifferent when he possesses actual, subjective knowledge of an excessive risk of harm to the prisoner's safety and disregards it. *Farmer*, 511 U.S. at 837-39. There is simply no evidence before the court that Defendants were deliberately indifferent to Plaintiff's safety.

Plaintiff, the non-moving party, must establish the existence of a genuine issue of material fact by presenting evidence on which a fact-finder could reasonably find in his favor. Plaintiff has failed to submit evidence to support his claim, or to put the material fact of this case--the failure to protect--in dispute. *See generally Gray v. Spillman*, 925 F.2d 90 (4th Cir. 1991). Although the non-moving party may rely upon a verified complaint when allegations therein are based on personal knowledge, *see Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991), Plaintiff's complaint is not verified. Accordingly, Defendants' unopposed Motion for Summary Judgment shall be granted.

## Conclusion

For the aforementioned reasons, Defendants' Motion, construed as a motion for summary judgment, shall be granted. A separate Order follows.


Date: <u>October 27, 2011</u>　　　　　　_____/s/_____
　　　　　　　　　　　　　　　　　　DEBORAH K. CHASANOW
　　　　　　　　　　　　　　　　　　United States District Judge